## IN ADMIRALTY.—DECISION OF CHIEF JUSTICE LEE.

## CHARLES B. FESSENDEN vs. THE CARGO OF THE SHIP "CHARLES."

The judicial power of this Court extends to all cases of admiralty and maritime jurisdiction, and this power may be exercised by the Chief Justice at Chambers.

When the general owner retains the possession, command and navigation of the ship, and contracts to carry a cargo or freight for the voyage, the charter party is considered as a mere affreightment, sounding in covenant ; and the freighter is not clothed with the character or legal responsibility of ownership.

Lien of the owner for the freight on the cargo shipped by the charterer, not extended by a clause in the charter party binding the vessel, her freight, tackle and appurtenances, on the one side, and the merchandise and freight to be laden on board, on the other side, to the faithful performance of the covenant.

The lien held to be waived on a part of the goods which had been delivered, notwithstanding the clause referred to above.

Held : that the owner had a lien on a portion of the goods which remained undelivered, for the whole freight remaining unpaid.

This is a libel *in rem*, brought for freight by Charles B. Fessenden against the cargo of the ship Charles, which freight is alleged to be ·due to the libellant as owner of the ship, under a charter party made by the libellant with A B. Howe, deceased, on a voyage from Boston, Massachusetts, to Honolulu, in the Sandwich Islands. On the arrival of the vessel at Honolulu most of the goods were delivered to A. B. Howe, and part of the freight paid, leaving a balance of over seven thousand dollars unpaid. Immediately following the delivery of the goods, Mr. Howe died, and such goods as remained unsold in his hands at the time of his decease passed into the hands of the public Administrator. The agent of Mr. Fessenden called on the Administrator for payment of the balance of the freight, but the estate being insolvent, the Administrator declined payment, whereupon the libellant brought this suit against the cargo remaining in the hands of the Administrator, and the proceeds of such goods as had been sold but not delivered. The remainder of the goods were then sold, and the proceeds substituted in the place thereof, by consent of parties. The Administrator has filed an answer denying the rights of

the libellant to any lien for the freight; and praying a restoration of the proceeds of the cargo to him.

Upon the hearing, Messrs. Harris and Montgomery were heard for the creditors of Mr. Howe against the prayer of the libellant, by permission of the Court and the Counsel for Fessenden; and made the following points: First, this cause does not properly come within the admiralty and maritime jurisdiction of the Court. Secondly, Howe was the owner of the ship for the voyage, by a fair interpretation of the charter party; he was personally bound to pay the gross sum of eleven thousand dollars for the charter; and the last clause of the charter party, (by which the parties mutually bind themselves to each other, the libellant, his vessel, her freight, tackle and appurtenances, and the shipper, the merchandise and freight to be laden on board, for the true performance of all and every of the covenants and agreements of the charter party,) is inoperative; and Fessenden can have no lien whatever on the goods, but must come in and share *pro rata* with the other creditors of the estate. Thirdly, the lien, if it ever existed, was waived by the delivery of the goods to Howe.

The first point relating to jurisdiction, may be disposed of, I think, without difficulty. The judicial power of this Court extends to all cases of admiralty and maritime jurisdiction, and this power may be exercised by the Chief Justice at Chambers. The legal as well as the popular sense of the phrase, "admiralty and maritime jurisdiction," includes jurisdiction of all things done upon and relating to the sea, or, in other words, all transactions and proceedings in relation to commerce and navigation, and to damages or injuries upon the sea. It extends to and includes all maritime contracts, whether executed at home or abroad, and whatever may be the form of the stipulations; and I feel no hesitation in pronouncing my opinion, that this cause is within our admiralty jurisdiction; for all jurists agree in classing charter parties as among maritime contracts. The jurisdiction of courts of admiralty in cases like the present, as well as in all other cases, is most elaborately discussed in the great and luminous opinion of Mr. Justice Story, in the famous case. of De Lovio *vs.* Boit and others, (2 Gallison's Reports 398,) and I cannot conceive how a doctrine can be more firmly established than it was on that occasion, when the learned judge determined that the admiralty jurisdiction of the Courts of the United States "extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea." This doctrine was confirmed in a series of cases in the Courts of the United States, in Plummer *vs.* Webb, (4 Mason's Report 380,) the schooner Tilton, (5 Mason's Report 465,) the the schooner Volunteer and cargo, (1 Sumner R. 551,) the schooner Tribune, (3 Sumner R. 144,) and in a long list of other cases. The case of the "Volunteer and cargo" is directly in point, and these and the other cases cited are of high authority, as our admiralty jurisdiction is the same as that of the Courts of the United States. The jurisdiction of courts of admiralty in cases like the present, where the suit is founded upon a claim on freight under a charter party, for a voyage on the high seas, especially where the charter party is made in a foreign port, has been traced back by the learned Judge Story, to the very earliest records of the English Admiralty Courts.

The next question is, whether Howe by a fair interpretation of the charter party was the owner of the ship for the voyage. The terms of the instrument are as follows: " First, That said party of the first part, (Fessenden) does engage that the said vessel in and during said voyage shall be kept tight, staunch, well fitted, tackled and provided with every requisite, and with men and provisions necessary for such voyage."

" Second, That the said party of the first part, does further engage that the whole of said vessel (with the exception of the cabin and necessary room for the accommodation of the crew, and the stowage of sails, cables and provisions,) shall be at the sole use and disposal of the said party of the second part, (Howe,) during the voyage aforesaid; and that no goods or merchandise whatever shall be laden on board, otherwise than from the said party of the second part, or his agent, without his consent, on pain of forfeiture of the amount of freight agreed upon for the same."

" Third, The said party of the first part, does further engage to take and receive on board the said vessel all such lawful goods and merchandise as the said party of the second part, or his agents, may think proper to ship; also specie if any is offered."

In consideration whereof Howe agrees to charter and hire the vessel on the terms following, that is to say:

" First, The said party of the second part, (Howe,) does engage to provide and furnish the said vessel with a suitable cargo."

" Second, The said party of the second part, (Howe,) further engages to pay to the said party of the first part, (Fessenden,) or his agent, for the charter or freight of the said vessel during the voyage aforesaid, in manner following, that is to say: At and from Boston to Honolulu, Sandwich Islands, eleven thousand dollars, payable on discharge of the cargo, in American gold or Mexican dollars, free of Commissions."

Then follows a clause relating to demurrage, and it concludes as follows:

" To the true performance of all and every of the foregoing covenants and agreements the said parties each to the other, do hereby bind themselves, their heirs, executors, administrators, and assigns, (especially the said party of the first part the said vessel, her freight, tackle and appurtenances; and the said party of the second part, the merchandise and freight to be laden on board,) each to the other in the penal sum of eleven thousand dollars."

It appears to me there cannot be a doubt that Howe was not the owner for the voyage. The ownership by a fair construction of the charter party remained in Fessenden. The master was appointed by him, and acted as his agent; the crew were hired and paid by him, the vessel was victualled, manned and run at his expense. Fessenden had the control and navigation of the vessel, and made an express exception of the cabin and necessary room for the accommodation of the crew, and the stowage of the sails, cables and provisions. Howe could not be considered the owner for the voyage, unless he had the exclusive possession, command and navigation of the ship, which he did not have. The sound and settled rule on this subject is, that where the general owner retains the possession, command and navigation of the ship, as Fessenden most clearly did in this case,

and contracts to carry a cargo or freight for the voyage, the charter party is considered as a mere affreightment, sounding in covenant; and the freighter is not clothed with the character or legal responsibility of ownership. In the case of the schooner Volunteer and cargo, (1 Sumner's Rep., 567, 568,) which is identical with this case in nearly all of its leading features, and in which the charter party was nearly word for word the same, the court decided that the general owner remained the owner for the voyage. The language used by the learned judge was as follows : " The vessel was equipped, and manned, and victualled by him; and at his expense during the voyage, and he covenanted to take on board such goods in the voyage, as the charterers should think proper. The whole arrangements on his part, in these respects, sound merely in covenant. It is true, that in another part of the instrument, it is said, that he has letten to freight, (which may seem to import a present *demise* or *grant*, and not a mere covenant,) the whole schooner for the voyage. But this language is qualified by what succeeds, and the whole schooner is not let, for there is an express exception of the cabin and certain portions of other room under deck. If the whole schooner, then, was not granted during the voyage on freight, how is it possible to contend, that the libellant did not still remain owner for the voyage ? The master was his master, appointed by him, and responsible to him; the crew were hired and paid by him, and the victualling and manning were at his expense. He also retained the exclusive possession of a part of the vessel for the voyage, and the control and navigation of her during the voyage. Taking, then, the whole instrument together it seems wholly inconsistent with the manifest intent of the parties, that the charterer should be the owner for the voyage."

The cases of Hooe *vs.* Groverman, (I Cranch R 214,) Mascardier *vs.* Chesapeake Insurance Company, (8 Cranch R. 39,) Gracie *vs.* Palmer, (8 Wheaton R. 605,) Certain Logs of Mahogany, (2 Sum. R. 589,) and many others found cited in 3 Kent 137, 138, and Abbott on Shipping, Sixth Am. Ed. 368, n., all uphold the same doctrine. See also Angell on Carriers, § 379.

We now come to the question, whether Fessenden had under the charter party a lien on the cargo for his freight. He certainly had a lien by the common law on the cargo for the freight, so long as he retained possession of the goods, and I see no stipulations in the charter party inconsistent with such a lien. The charter party contains an express clause at its close by which the parties bind themselves each to the other, their heirs, executors, administrators and assigns, Fessenden the vessel, her freight, tackle and appurtenances; and Howe the merchandise and freight to be laden on board, to the true performance of all and every of the foregoing covenants and agreements of the charter party. It is said on the authority of Abbott on Shipping and the cases therein cited, that this clause is inoperative and can not bind the cargo. I confess I can see no reason for saying that such a clause shall have no meaning or operation; that it is a mere nullity, and cannot affect the parties in any way; and if there were no authorities to sustain me in the doctrine, I should be inclined to decide that the clause did have meaning and force—that it was not inoperative, but on the contrary, that it created a clear and positive lien on the cargo for the payment of the freight. But happily

M

we have a high authority for so ruling, in the case of the schooner Volunteer and cargo, precisely in point, where Judge Story after an able review of all the authorities upon which the doctrine contended for is maintained, supported the lien.    After stating that the clear and determinate meaning of the clause is, that the cargo shall be responsible for the payment of the freight, he says: " The words are of this import: they are sensible in the place where they occur; they are as much a part of the instrument as any other clause; and it was clearly competent for the parties to enter into such an agreement, if they chose so to do.    If the instrument had expressly declared, that there should be no lien on the cargo for the freight, it cannot be doubted that the stipulation would have been obligatory on the parties."    It may ill become me, having so little experience in questions of this nature, to utter my opinion in strong terms; but really, I look upon the doctrine that would compel us to declare this clause of the charter party an unmeaning, inoperative nullity, as having no foundation in reason or principle.    The words are used by the parties for some purpose, they are sensible where they occur, and constitute a part of the agreement, and I think should be carried into effect, at least, so far as to uphold the lien of the libellant.

The last question is whether the lien was not waived by the delivery of the goods to Howe.    There is no doubt in my mind that Fessenden had the right under the charter party to *detain* the cargo until his demands for freight were satisfied, but having parted with the possession of the goods without insisting upon his lien, it becomes very questionable whether it is not gone.    The general signification of the term Lien, as applied to maritime matters, is defined to be, the right which one person in certain cases possesses of detaining property placed in his possession, belonging to another, until some demand, which the former has, be satisfied; and as a general rule, if he once voluntarily relinquishes that possession after the lien attaches, the lien is gone. There are exceptions to this rule, but I know of none in the case of common carriers.    Owners and masters of ships may detain the goods carried by them until the freight or price of the carriage is paid, unless there be some agreement or stipulation in the charter party to the contrary; but if the master once voluntarily parts with the possession and control of the goods he loses his lien upon them and can not afterwards retain them.    (Abbott on Shipping, 377, 378, Whittaker on Lien, 95 to 99, Angell on Carriers, § 370.)    By the terms of the charter party in this case, the freight or hire of the ship was to be paid on the discharge of the cargo, that is simultaneous or concurrent with the discharge, and the master might have insisted on his lien.    But it would seem that he did not; and by voluntarily delivering the goods without insisting on the payment, or some security therefor, he has waived his lien, unless it is saved by the special clause at the close of the charter party, to which we have before made reference. It is said that this clause is in the nature of a *mortgage* on the cargo, conditioned for the faithful performance of all the covenants and agreements of the charter party, which gives the ship owner a higher, more extended, and durable lien than that created by the common law; and that the change of possession cannot affect it, so long as the goods do not pass into the hands of third persons.    In other words, that while the goods remain in the hands of Howe or his representa-

tives, the lien for the freight holds firm; and that in equity the goods may be libelled, and the payment of freight compelled in preference to the claims of other creditors. In support of this doctrine the case of the schooner Volunteer and cargo, is cited, but that case does not go to this length; for the learned judge in that case only went so far as to say that the owner of the vessel might detain the cargo for his freight. I know of no case where the principle of lien has been extended to reach the goods after the master has voluntarily delivered them to the shipper, without insisting on his lien, and I should not feel warranted in carrying it to the extreme contended for, unless urged to it by a clear sense of duty arising from the express stipulations of the parties. As we have no precedents to guide us in this extension, let us examine the grounds on which it is urged.

First, does the mutual obligation at the close of the charter party amount to a mortgage on the goods and merchandise laden on board, as the counsel for the libellant contends ? I think it does not, but is rather in the nature of a pledge. A mortgage of goods is a conveyance of the same by which the whole legal title passes conditionally to the mortgagee, and if not redeemed at the time stipulated, the title becomes absolute at law, though equity will interfere to compel a redemption. Does the obligation in this case answer to the definition or meaning of a mortgage ? Is there any grant or conveyance of the legal title or general property in the cargo to Fessenden on certain conditions ? By no means; and the most that could be urged is, that Fessenden had a special property in the goods, while the general property remained in Howe. That is, he stood in the condition of a pledgee, and held the goods as a pledge for the payment of the freight or hire of the ship. The most that the clause gives him, in my opinion, is a mere right of *detention* or *retainer*, a lien on the goods for the freight money, but no such property therein, as would necessarily result from an actual transfer of the goods by a deed or other legal conveyance, by way of mortgage. Mr. Justice Story in considering the doctrines of equity applicable to mortgages and pledges of personal property, says: "A mortgage of personal property differs from a pledge. The former is a conditional transfer or conveyance of the property itself.; and, if the condition is not duly performed, the whole title rests absolutely at law in the *mortgagee*, exactly as it does in the case of a mortgage of lands. The latter only passes the possession, or, at most, a special property only to the pledgee, with a right of retainer, until the debt is paid, or the other engagement is fulfilled." (Vide 2 Story Eq., § 10, 30, Whittaker on Lien, 128.) If then the libellant is viewed in the light of a quasi *pledgee* of the goods, his lien or right to the pledge was waived or extinguished when he yielded up his possession, by delivering back the goods to Howe. The lien of a pledgee on goods has no basis but that of possession, and if he relinquishes that possession, although the debt remains unpaid, the lien is gone, and his title ended. (Homes *vs.* Crane, 2 Pick R., 610, Ward *vs.* Sumner, 5 Pick. R. 59, Story on Bailments, § 287, 299, 364.

Possession, in relation to carriers, is not only essential to the creation of a lien on the goods, but equally so to the continuance of the lien; and when the master of a vessel once voluntarily parts with the possession of the goods out of his own or his agent's hands, he loses his lien upon them, and cannot reclaim them. (Abbott on Shipping,

377; Angell on Carriers, § 370; 2 Kent 639.) If I were to extend the doctrine of lien beyond possession, and allow it to follow the goods after delivery, I should go beyond all former decisions, and, in my opinion, establish a precedent opposed to public policy, the freedom of trade, and the safety of creditors. It might be giving the importers of goods the appearance of being absolute owners of property not belonging to them, and thus by holding out false colors seduce others into giving them a trust and credit on the faith of such ownership. I am content to stop where Mr. Justice Story has stopped in the case of the schooner Volunteer and cargo, and say that the clause repels any presumption that the libellant had waived any lien on the cargo for the freight, and furnished him with the *right to detain* the cargo until his claim for freight was satisfied. Further than this I cannot go.

But even allowing the clause of the charter-party in question to be a mortgage on the goods, which I do not admit, it might be somewhat questionable, whether the *mortgagee* by delivering back the goods to the possession of the *mortgagor*, after the maturity of his claim, did not invalidate his mortgage so far as other creditors are concerned.

There is still one question remaining, which was not raised in the argument, namely, what is the extent of the libellant's lien on that portion of the cargo not delivered. In other words, has he a lien on the portion not delivered for the whole freight or hire of the ship remaining unpaid, or only for such part of the freight as is properly chargeable to these undelivered goods. I am of the opinion that he has a lien on the undelivered goods for the whole freight remaining unpaid; for a delivery of a portion of several parcels of goods belonging to one owner, and carried on the same voyage, does not defeat a lien upon the remainder for the whole freight. If the freight is all consigned to the same person, and the master make a delivery of part of the goods to the consignee, he may *retain* the residue even against a purchaser, until payment of the freight of the whole. But if the goods are sold to different persons by the consignee, and part is delivered, the master has not a lien on the residue so as to compel one purchaser to pay freight for what has been delivered to another purchaser; but only for what has been purchased by himself. (Soldergreen *vs.* Flight, cited in 6 East, 622; Abbott on Shipping, 377, Note 2; Angell on Carriers, § 377, Note 2.)

My judgment is, First, that the lien of the libellant on the portion of the cargo undelivered is good to the full extent of the proceeds of those goods, and I accordingly decree that the same be paid to the libellant. Secondly, that the lien of the libellant on the goods was lost when the master parted with the possession of them, and I accordingly decree a restitution of the proceeds, arising from the sale thereof to the Administrator of Howe. It is further decreed that the costs of this suit be equally divided between the libellant and respondents.